IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VIOLET GALLAGHER, : 
 :
 Plaintiff :
 : No. 4:12-cv-00777
 v. :
 : (Judge Brann)
EAST BUFFALO TOWNSHIP, :
 :
 Defendant. :

## MEMORANDUM

August 29, 2013

For the following reasons, defendant's motion for summary judgment on

plaintiff's federal claim is granted; plaintiff's motion for summary judgment is

denied; and jurisdiction over plaintiff's state law claims is relinquished.

## I.       The Complaint

On April 25, 2012, plaintiff Violet Gallagher (hereinafter, "Gallagher") filed

a complaint against defendant East Buffalo Township (hereinafter, the

"Township") seeking relief for alleged violations of the federal Clean Water Act,

33 U.S.C. § 1251, et seq., Pennsylvania's Clean Streams Law, 35 P.S. § 691.1, et

seq., and Pennsylvania's Stormwater Management Act, 32 P.S. § 680.1, et seq., as

well as for common law nuisance and trespass. (Compl., ECF No. 1). All of the

claims arise from the discharge of supposedly "turbid, malodorous, garbage laden

water" onto Gallagher's property and into a tributary of the Susquehanna River by the Township's stormwater management system. (Id. ¶ 2).

## II.    Summary Judgment Standard

The parties have filed cross-motions for summary judgment. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all reasonable inferences in the nonmovant's favor, "could return a verdict for the nonmoving party." Id.

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for

purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Thus, where the moving party's motion is properly supported and his evidence, if not controverted, would entitle him to judgment as a matter of law, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250. In the face of the moving party's evidence, the nonmoving party's mere allegations, general denials or vague statements will not create a genuine factual dispute. <u>See Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund</u>, 12 F.3d 1292, 1302 (3d Cir. 1993). Only citation to specific facts is sufficient. <u>Anderson</u>, 477 U.S. at 250.

Where the nonmoving party has had adequate time for discovery and will bear the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment is warranted. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

When considering cross-motions for summary judgment, the Court considers each motion separately, applying the standard set forth above. <u>See Transportes Ferreos de Venezuela II CA v. NKK Corp.</u>, 239 F.3d 555, 560 (3d Cir. 2001)

(quoting <u>Rains v. Cascade Indus., Inc.</u>, 402 F.2d 241, 245 (3d Cir. 1968) (cross-motions for summary judgment "are no more than a claim by each side that it alone is entitled to summary judgment"); <u>Benckini v. Hawk</u>, 654 F. Supp. 2d 310, 315 (E.D. Pa. 2009). The Court cannot view "facts" in the light most favorable to two nonmoving parties simultaneously, and in some cases the best course may be to recite two statements of "facts" for the same case or even to write entirely separate opinions disposing of the respective motions. <u>See Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown</u>, 318 F. Supp. 2d 230, 236 (M.D. Pa. 2004) (Conner, J.). The Court in this case has written a single opinion with a single recitation of the facts because the factual disputes between the parties are few.

## III. Statutory Background of the Dispute

Ms. Gallagher's federal claim reaches this Court pursuant to the Clean Water Act's (hereinafter, "CWA") "citizen suit" provision, which permits (with certain limitations) "any citizen [to] commence a civil action on his own behalf . . . against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of . . . an effluent standard or limitation under [Chapter 26 of Title 33]," which is the chapter of the United States Code enumerating laws with respect to "Water Pollution Prevention and Control."

33 U.S.C. § 1365(a)(1)(A).

Within Chapter 26, there is 33 U.S.C. § 1311(a), which makes "the discharge of any pollutant by any person . . . unlawful," subject to certain exceptions. "Discharge of a pollutant" is defined, in relevant part, as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Pollutants" are defined, in relevant part, as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). A "point source" is defined, in relevant part, as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

The broad prohibition of Section 1311(a) is significantly narrowed, however, by 33 U.S.C. § 1342(a), which provides that the Administrator of the Environmental Protection Agency[1] ("EPA") "may . . . issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section

_____

[1]A state that has met certain requirements may also issue permits. See 33 U.S.C. § 1342(b) & (c).

1311(a) of this title, upon condition that such discharge will meet [certain requirements]." Together, these provisions make up the CWA's "central . . . requirement that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States." Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1331 (2013).

As pertinent to Ms. Gallagher's claim, the prohibition of Section 1311(a) is narrowed further still by the Congressional grant of authority to the EPA to "leave [some] stormwater discharges unregulated."[2] Conservation Law Found. v. Hannaford Bros. Co., 327 F. Supp. 2d 325, 331 (D. Vt. 2004). Benign as it may sound, "storm water is often heavily polluted." Los Angeles Cnty. Flood Control Dist. v. Natural Res. Def. Council, Inc., 133 S. Ct. 710, 712 (2013). Nevertheless, exercising its authority to exempt certain storm water discharges from the permit requirement, the EPA has provided that an operator – such as the Township here – of a "small municipal separate storm sewer system" (known as an "MS4")[3] is

_____

[2] "Storm water" is "storm water runoff, snow melt runoff, and surface runoff and drainage." 40 C.F.R. § 122.26(b)(13).

[3] A "municipal separate storm sewer" is defined at 40 C.F.R. § 122.26(b)(8) as:

> a conveyance or system of conveyances (including roads with
> drainage systems, municipal streets, catch basins, curbs, gutters,

required to obtain a permit for "discharges composed entirely of storm water" only

when the MS4 "is located in an urbanized area as determined by the latest

Decennial Census by the Bureau of the Census" or designated for regulation by an

NPDES permitting authority. 40 C.F.R. §§ 122.26(a)(9)(i)(A)-(D) & 122.32(a).

The parties agree that the Township is not located in an "urbanized area" and that it

has not been designated for regulation. (See Def.'s Facts, May 10, 2013, ECF No.

38 ¶¶ 3, 6-8) (hereinafter, "Def.' s Facts"). See also United States Environmental

Protection Agency, Office of Water, EPA 833-F-00-004, Urbanized Areas:

Definition and Description (2012). The parties dispute, rather, involves the

—————————————

ditches, man-made channels, or storm drains):

(i)     Owned or operated by a State, city, town, borough, county,
        parish, district, association, or other public body (created by or
        pursuant to State law) having jurisdiction over disposal of
        sewage, industrial wastes, storm water, or other wastes,
        including special districts under State law such as a sewer
        district, flood control district or drainage district, or similar
        entity, or an Indian tribe or an authorized Indian tribal
        organization, or a designated and approved management agency
        under section 208 of the CWA that discharges to waters of the
        United States;

(ii)    Designed or used for collecting or conveying storm water;

(iii)   Which is not a combined sewer; and

(iv)    Which is not part of a Publicly Owned Treatment Works
        (POTW) as defined at 40 CFR 122.2.

7

threshold issue of whether discharges from the Township's MS4 are "composed entirely of storm water."

## IV.    Factual Background

The reader should consider the following facts undisputed unless otherwise noted.

For over 35 years, Ms. Gallagher has owned and resided at 425 Beagle Club Road outside Lewisburg, Pennsylvania (the "Gallagher property"). (Def.' s Facts ¶ 1). The Gallagher property is on the south side of Beagle Club Road, an east-west public way that is currently owned and maintained by the Township. (Id. ¶¶ 10, 13). On the north side of Beagle Club Road is the Fox Hollow property, which, prior to 1989, was approximately 31 acres of undeveloped land, but which was developed into residential lots between 1989 and 1997. (Id. ¶¶ 11-12).

Since (at the latest) 1990, there has been a drainage pipe running north-south under Beagle Club Road. (Id. ¶¶ 14, 16).  The pipe, currently owned and maintained by the Township, discharges onto the Gallagher property. (Id. ¶¶ 14-15). A drainage ditch, likewise owned and maintained by the Township, also runs along the Gallagher side of Beagle Club Road. (Id. ¶ 19; Pl.'s Facts, May 10, 2013, ECF No. 41 ¶ 6 (hereinafter, "Pl.'s Facts")). In 1999 or 2000, the Township – by installing a new berm (Gallagher's contention) or paving an existing berm (the

Township's contention) by the ditch – directed the discharge from the ditch to the same point where the drainage pipe discharges onto the Gallagher property. (Pl.'s Facts ¶ 8; Def.'s Facts ¶ 19).

When it rains, the pipe and ditch discharge storm water onto the Gallagher property. (Pl.'s Facts ¶¶ 10-11). Much of the water discharged onto the Gallagher property from the pipe comes from a detention basin that drains the western part of the Fox Hollow property. (Id. ¶ 14). Water discharged from the ditch comes off Beagle Club Road itself and from private properties to the north and west of the Gallagher property. (Id. ¶ 15). (See also Pl.'s Opp'n Br., June 3, 2013, ECF No. 48, at 8 n.5 (hereinafter, "Pl.'s Opp'n Br.") (water from basement sump pumps pushes onto Beagle Club Road)).

From the Gallagher property, the water – which contains sediment and other pollutants, including garbage, animal waste, and petroleum products – discharges into an unnamed tributary of the Susquehanna River. (Id. ¶¶ 16, 18). The Township does not possess an NPDES permit associated with the discharge. (Id. ¶ 21).

## V.     Defendants' Motion for Summary Judgment on Plaintiff's Federal Claim is Granted; Plaintiff's Motion for Summary Judgment is Denied; Jurisdiction over Plaintiff's State Law Claims is Relinquished.

The parties agree on the single issue at the crux of Ms. Gallagher's CWA

claim: whether the discharges from the Township's MS4 (the drainage pipe and ditch) are "composed entirely of storm water" <u>vel non</u>. If the discharges are "composed entirely of storm water," then the Township does not need an NPDES permit to comply with the CWA. <u>See Conservation Law Found. v. Hannaford Bros. Co.</u>, 327 F. Supp. 2d 325, 332 (D. Vt. 2004) ("[In 1999], a stormwater discharge left unregulated fell into compliance with [33 U.S.C. 1342(p)] unless EPA or an authorized state agency later exercised its residual designation authority to require an NPDES permit for that discharge. A stormwater discharge that complies with § [1342(p)] does not violate [33 U.S.C. § 1311(a)]."). If the discharges are not "composed entirely of storm water," then a permit is required because the Township admits the water contains pollutants. <u>See</u> 33 U.S.C. § 1311(a) ("Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.").

Unfortunately, the determinative phrase – "composed entirely of storm water" – is undefined by law or regulation and the parties disagree on the proper interpretation. The Township takes the view that a discharge is "composed entirely of storm water" even when it "includes pollutants that are incidental to stormwater runoff." (Def.'s Br., May 10, 2013, ECF No. 37, at 24). Thus, according to the

10

Township, Ms. Gallagher must present evidence showing that the Township has been actively adding pollutants to the storm water that discharges onto her property (and into the tributary) in order to overcome the Township's motion for summary judgment. (Id. at 26). It is undisputed, moreover, that neither Ms. Gallagher nor any other deponent has testified to having witnessed the Township adding pollutants to the storm water. (Def.'s Facts ¶¶ 26-29). The parties agree that the pollutants discharged onto the Gallagher property are picked up and carried by storm water flowing to and through the MS4. (Id. ¶ 29).

Ms. Gallagher, on the other hand, takes the view that "[t]he phrase 'composed entirely of storm water' means what is says, storm water, not pollutants." (Pl.'s Opp'n Br., at 8). Moreover, even assuming her burden is to present evidence of the Township having actively added pollutants, she argues the Township's assertion "that it has not added pollutants to the storm water it is discharging . . . is incorrect and contradicted by the record." (Id. at 11). It is the construction of the MS4 itself (i.e., the way the pipe and ditch "channel[], concentrate[], and discharge[] stormwater"), she reasons, that "causes erosion, and thereby the addition of pollutants at a rate enormously larger than what is normally expected in connection with storm water runoff." (Pl.'s Opp'n Facts, June 3, 2013, ECF No. 49 ¶ 26). Ms. Gallagher contends that this extraordinary situation cannot

be reasonably characterized as involving only pollutants "incidental" to storm water runoff.

Ms. Gallagher's interpretation of the relevant language – "[t]he phrase 'composed entirely of storm water' means what is says, storm water, not pollutants" (Pl.'s Opp'n Br., at 8) – is appealing in its simplicity. But it makes little sense when viewed in the context of the statutory scheme.[4] The CWA prohibits the discharge of any pollutant from a point source without a permit. <u>See</u> 33 U.S.C. §§ 1311(a) & 1342(a). To discharge "storm water, <u>not pollutants</u>" does not require a permit, and where a permit is not required in the first place, there is no purpose for a permit exemption. <u>See Waterkeeper Alliance, Inc. v. EPA</u>, 399 F.3d 486, 505 (2d Cir. 2005) ("[I]n the absence of an actual addition of any pollutant to navigable waters from any point, there is no point source discharge, no statutory violation, no statutory obligation of point sources to comply with EPA regulations for point source discharges, and no statutory obligation of point sources to seek or obtain an NPDES permit in the first instance."). Thus when Congress, in the Water Quality

---

[4]When deciding what the law is in this context, the Court first seeks to discover whether Congress has unambiguously addressed the issue in dispute. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984). If Congress's intent is unclear, the Court will give effect to a "permissible construction of the statute" by the implementing agency (here the EPA). <u>Id.</u> at 843-45.

Act of 1987, created an exemption from the existing permit requirement for "discharges composed entirely of stormwater," 33 U.S.C. § 1342(p)(1), it must have contemplated that such discharges contained pollutants. See Silverman v. Eastrich Multiple Investor Fund, L.P., 51 F.3d 28, 31 (3d Cir. 1995) (internal quotation marks omitted) ("[A] basic tenet of statutory construction [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.").

Likewise, the structure of the statutory provision from which the relevant language derives suggests that "discharges composed entirely of stormwater" contain pollutants. In relevant part, as codified, the provision states:

(1) General rule

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

(2) Exceptions

Paragraph (1) shall not apply with respect to the following stormwater discharges:

(A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.
(B) A discharge associated with industrial activity.

13

(C) A discharge from a [MS4] serving a population of 250,000 or more [(a large MS4)].

(D) A discharge from a [MS4] serving a population of 100,000 or more but less than 250,000 [(a medium MS4)].

(E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

. . .

(5) Studies

The Administrator, in consultation with the States, shall conduct a study for the purposes of–

(A) identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

(B) determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

(C) establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

. . .

(6) Regulations

Not later than October 1, 1993, the Administrator, in consultation with State and local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. . . .

33 U.S.C. § 1342(p). Just a few ticks after the buzzer, in 1999, the EPA, pursuant to its authority under 33 U.S.C. § 1342(p)(6), indeed designated other "discharges

composed entirely of storm water," in addition to those already listed in 33 U.S.C. § 1342(p)(2), for which an NPDES permit would be required.[5]

As the codification makes explicit, Congress set forth a general rule exempting "discharges composed entirely of stormwater" from the permit requirement, followed by enumerated exceptions (now including exceptions promulgated pursuant to 33 U.S.C. § 1342(p)(6) in addition to those listed in 33 U.S.C. § 1342(p)(2)). According to this structure, any "discharge composed entirely of stormwater" is presumptively exempt from the permit requirement, but that presumption is overcome ("shall not apply") when the discharge, though "composed entirely of stormwater," is, for example, simultaneously "associated with industrial activity."

The exception in 33 U.S.C. § 1342(p)(2)(E) – for "[a] discharge for which the Administrator . . . determines that the stormwater discharge . . . is a significant contributor of pollutants to waters of the United States" – is suggestive of the meaning of "composed entirely of storm water." Specifically, the exception suggests that Congress contemplated a species of discharge simultaneously "composed entirely of storm water" and yet "a significant contributor of pollutants

---

[5]The EPA designated, among other discharges, storm water discharges from certain small MS4s not including the Township's. See 40 C.F.R. § 122.26(a)(9)(i)(A).

to waters of the United States." Conversely, if, as suggested by Ms. Gallagher, "composed entirely of storm water" meant "storm water, not pollutants," it would be more than odd for Congress to have provided, essentially, that discharges that add no pollutants to the waters of the United States require a permit when they are a significant contributors of pollutants to the waters of the United States.

Similarly, it would be strange for Congress to have ordered the EPA to study, according to Ms. Gallagher's interpretation, pollutant-free storm water discharges to determine "the nature and extent of pollutants in such discharges" in 33 U.S.C. § 1342(p)(5).

Ms. Gallagher's interpretation is also at odds with the limited legislative history behind the Water Quality Act of 1987. Debating the legislation, representatives contemplated:

> new language [that] will properly reduce the universe of permits required for storm water from millions to thousands without reducing the protection of the environment. We established a mechanism that will require permits only where necessary – rather than in every instance. Without these changes, local, State, and Federal officials would be inundated with an enormous permitting workload even though most of the discharges would not have significant environmental impacts.

133 Cong. Rec. 985 (1987) (statement of Rep. Hammerschmidt). The reduction in the universe of permits would occur by departing from "current judicial and administrative interpretations of the law [holding that] businesses and

municipalities that channel and discharge ordinary stormwater into a navigable water must obtain NPDES permits." Id. at 991 (statement of Rep. Stangeland). The intended departure would eliminate "potentially thousands of permits for churches, schools, [and] residential property, runoff that poses no environmental threat and does not warrant the expense and dilution of personnel and resources that would be required to permit and monitor these harmless discharges." 131 Cong. Rec. 19850 (1985) (statement of Rep. Rowland).

In place of the then-current regime, "[t]he provisions in th[e] bill [would] require permitting for all of those systems, not points of runoff but systems, of population[s] above 250,000 within certain time limit constraints. It also [would] provide for permitting of those between 100,000 and 250,000, of those systems. [The law would] not make any provision[] . . . that would require permitting of less than 100,000 unless there was some problem with the pollution source from those runoffs." 133 Cong. Rec. 994 (1987) (statement of Rep. Rowland). That is, "storm sewer systems . . . serving populations of 100,000 or less [would] be covered by the first round of permits where they contribute[d] to water quality problems or contribute[d] significantly to pollution of the waters of the United States [(and by the second round of permits if designated by the EPA pursuant to 33 U.S.C. § 1342(p)(6))]," but not otherwise. Id. at 1280 (statement of Sen. Durenberger).

Thus, a major goal of the legislation was to substantially reduce storm water-related permit applications by limiting the description of point sources required to obtain permits. But if every discharge of storm water containing pollutants was ineligible for the permit exemption because – according to Ms. Gallagher's interpretation – the discharge was not "composed entirely of storm water," the legislation would do no such thing. Pollutants are ubiquitous in storm water, a fact of which it is safe to say legislators were aware based on their perception of the permitting "nightmare" posed by storm water, 131 Cong. Rec. 15657 (1985) (statement of Sen. Wallop), and a then-recent EPA "national urban runoff" study which found "63 toxic pollutants, including 13 toxic metals, in the discharge from municipal separate storm sewers that were studied. Of these, lead, copper, and zinc were the most pervasive; EPA found these pollutants in at least 91 percent of its samples." 133 Cong. Rec. 1280 (1987) (statement of Sen. Durenberger). It is hard to imagine legislators defining "discharges composed entirely of storm water" as "storm water, not pollutants," when doing so would have undermined a major purpose of the relevant provision.

The EPA's implementation of the Water Quality Act of 1987 is also inconsistent with Ms. Gallagher's interpretation of "discharges composed entirely of storm water" in important ways. In addition to carrying over the statutory

18

language discussed <u>supra</u>, the regulation provides: "Any person may petition the Director to require a NPDES permit for a discharge which is composed entirely of storm water which contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 40 C.F.R. § 122.26(f)(2). The Director must "make a final determination on any petition received . . . within 90 days." <u>Id.</u> § 122.26(f)(5). If the Director "determines that the discharge . . . contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States," <u>Id.</u> § 122.26(a)(9)(i)(D), the discharger must "seek coverage under an NPDES permit." <u>Id.</u> § 122.26(a)(9)(ii).

In addition to affirming, contrary to Ms. Gallagher's contention, that a "discharge which is composed entirely of storm water" can be, simultaneously, "a significant contributor of pollutants to waters of the United States," the regulation contemplates a regulatory scheme consistent with the goals expressed in the legislative history discussed <u>supra</u>. That is, the regulation limits the permit requirement to certain categories of recognized high priority storm water point sources. <u>See</u> 40 C.F.R. § 122.26(a)(9)(i). Storm water discharges outside of those categories – even if the discharges contain pollutants – do not require a permit unless they "contribute[] to a violation of a water quality standard or [are] a

significant contributor of pollutants to waters of the United States," as determined

by the EPA. Id. § 122.26(a)(9)(i)(D) (emphasis added). To assist the EPA in

determining appropriate candidates for designation under 40 C.F.R. §

122.26(a)(9)(i)(D), the regulation provides for the timely review of petitions

submitted by "any person" concerned about the environmental effects of a

particular storm water discharge. 40 C.F.R. § 122.26(f)(2). But the discharger who

is otherwise not required to obtain a permit need not seek a permit until the EPA

makes its determination.

The EPA describes the regulatory scheme as:

> one that balances automatic designation on a nationwide basis and
> locally-based designation and waivers. Nationwide designation applies
> to those classes or categories of storm water discharges that EPA
> believes present a high likelihood of having adverse water quality
> impacts, regardless of location. . . . Additional sources are not covered
> on a nationwide basis either because EPA currently lacks information
> indicating a consistent potential for adverse water quality impact or
> because EPA believes that the likelihood of adverse impacts on water
> quality is low, with some localized exceptions.
>
> . . .
>
> Coverage can be extended to municipal and construction sources outside
> the nationwide designated classes or categories based on watershed and
> case-by-case assessments. For the municipal storm water program,
> today's rule provides broad discretion to NPDES permitting authorities
> to develop and implement criteria for designating storm water discharges
> from small MS4s outside of urbanized areas.

National Pollutant Discharge Elimination System – Regulations for Revision of the

Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed.

Reg. 68722, 68734 (Dec. 8, 1999).

The Court recognizes that much could be done to help clarify the meaning

and function of the phrase "composed entirely of storm water."[6] That said, in light

of the analysis <u>supra</u>, the Court holds that the discharges from the Township's MS4

(the ditch and pipe) are "composed entirely of storm water" for purposes of the

applicable law and regulations, and are accordingly exempt from the NPDES

permit requirement.

_____

[6]<u>See, e.g.</u>, National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed. Reg. 47990, 47995, 48036-7 (Nov. 16, 1990) (discussing regulatory definition of "storm water" as well concepts such as "non-storm water" and "illicit discharge," primarily in relation to systems subject to regulation); Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. at 68756 (clarifying that even regulated MS4s, generally responsible for eliminating discharges "not composed entirely of storm water" from entering the MS4, "need only address the following categories of non-storm water discharges if the operator of the small MS4 identifies them as significant contributors of pollutants to its small MS4: water line flushing, landscape irrigation, diverted stream flows, rising ground waters, uncontaminated ground water infiltration (as defined at 40 CFR 35.2005(20)), uncontaminated pumped ground water, discharges from potable water sources, foundation drains, air conditioning condensation, irrigation water, springs, water from crawl space pumps, footing drains, lawn watering, individual residential car washing, flows from riparian habitats and wetlands, dechlorinated swimming pool discharges, and street wash water (discharges or flows from fire fighting activities are excluded from the definition of illicit discharge and only need to be addressed where they are identified as significant sources of pollutants to waters of the United States").

Whatever the precise bounds of the phrase "composed entirely of storm water,"[7] Ms. Gallagher's interpretation is impermissible. There is no genuine dispute that the pollutants discharged from the Township's MS4 are solely a function of the MS4 being used for its intended purpose of "collecting or conveying storm water." 40 C.F.R. § 122.26(b)(8)(ii). It would be contrary to statutory and regulatory design to conclude that an (otherwise exempt) operator of an MS4 must obtain a permit because its MS4 discharges pollutants collected and conveyed solely as an incident to the collection and conveyance of storm water. If she is concerned about the Township MS4's impact on the Susquehanna River and its tributaries, Ms. Gallagher's option is to petition the EPA for the MS4's designation as a significant contributor of pollutants to waters of the United States.

Ms. Gallagher's arguments urging this Court to exercise supplemental jurisdiction over her state law claims are not compelling, (see Pl.'s Opp'n Br., at 13-14), and the Court will relinquish jurisdiction in accordance with 28 U.S.C. § 1367(c)(3). See Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original) (quoting Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir.1995)) ("[W]here the claim over which the district court has original

_____

[7]The Court, for example, believes that no operator of a "municipal combined storm and sanitary sewer," see 33 U.S.C. § 1342(q), would be sheltered by the permit exemption for "discharges composed entirely of stormwater."

22

jurisdiction is dismissed before trial, the district court <u>must</u> decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.").

## VI.    Conclusion

For the foregoing reasons, defendant's motion for summary judgment on plaintiff's federal claim is granted; plaintiff's is denied. The Court relinquishes jurisdiction over the state law claims. An Order follows.

BY THE COURT:

    s/ Matthew W. Brann
Matthew W. Brann
United States District Judge